GOTTBERG *v.* UNITED STATES NAT. BANK *et al.*

(*Supreme Court, General Term, First Department.*  October 16, 1891.)

**1. PLEDGE BY EXECUTOR—LIABILITY OF PLEDGEE.**
Where a bank makes a loan to an executor individually, taking as collateral security registered bonds which belong to testator's estate, but the only fact apparent to the bank as to the borrower's character, and the ownership of the bonds, is the indorsement of registry in the name of executors on the bond immediately preceding the registry in the name of the bank, this is not sufficient to put the bank on inquiry as to the executor's authority to pledge these bonds to secure the loan.

**2. SAME—NOTICE.**
In order to charge the pledgee for misappropriation of securities by an executor, it is not necessary that such pledgee have direct evidence that the money is advanced to the executor for purposes not connected with the administration, but it is sufficient that there be brought to his knowledge facts sufficient to put a prudent man on inquiry.

13 N. Y. Supp. 841, affirmed.

Appeal from special term, New York county.

Action by Julius Gottberg, as executor of Mendlich Gottberg, against the United States National Bank and John J. Louth, who was plaintiff's co-executor, for the conversion of certain bonds belonging to testator's estate. Louth had applied to defendant bank for a loan on his individual note, offering as collateral security certain registered bonds of the St. Paul & Sioux City Railroad, which bonds were in fact the property of testator's estate and the subject of this action.  The bank agreed to make the loan on condition that the bonds should be registered in its name, this being its usual requirement in such cases.  Louth, by means of forged "stock powers," purporting to have been executed by plaintiff, procured the transfer and registry of the bonds, and when the bank took them there appeared on them, immediately preceding the registry in the name of the bank, a registry in the names of plaintiff and Louth as executors.  Neither the bank nor any of its officers had knowledge that Louth was executor of any estate, nor were the bonds seen by them until they were registered in the name of the bank.  Louth failed to pay his note when it was due, and the bank sold the bonds for the payment of its debt.  Mr. Justice BARRETT filed the following opinion at special term:

"Where one purchases property from a trustee, knowing that the subject is trust property, he is put upon inquiry as to the trustee's power to change or vary the securities.  But one who purchases property from an executor is not necessarily put upon even this inquiry.  'On the death of a testator,' says Mr. Perry in his work on Trusts, (section 809,) 'the personal estate vests wholly in the executor; and in order that he may execute his office the law permits him, with or without the concurrence of any co-executor, to sell or mortgage, by actual assignment or equitable deposit, with or without a power of sale, all or any part of the personal assets, legal or equitable.' For this proposition numerous authorities are cited in the notes to the fourth edition, and the principle may be said to be well established.  The distinction between a trustee and executor was referred to in *Duncan* v. *Jaudon*, 15 Wall. 175.  In the former case, namely, that of a trustee, Justice DAVIS observed 'that there is no presumption of a right to sell, as there is in the case of an executor.'  And in the same case below, reported under the name of *Jaudon* v. *Bank*, 8 Blatchf. 438, Justice BLATCHFORD observed that 'a trustee stands on a different footing from an executor or administrator, or even a guardian in many respects.  A trustee presumptively holds his trust property for administration, and not for sale.'

"Where, then, the securities show upon their face that they are trust property, the purchaser is put upon inquiry as to the power of the trustee to vary or change such securities.  In the case of an executor, however, this power is presumed as a necessary incident to the performance of his duties, and the

purchaser or pledgee is protected if he pays or advances his money in good faith, and without knowledge of any intended misapplication by the executor. What neither a trustee nor an executor can do, without peril to the purchaser or pledgee, is to dispose of or pledge his *cestui que trust's* or testator's assets in payment of or as security for a debt of his own. *Field* v. *Schieffelin*, 7 Johns. Ch. 150; *Shaw* v. *Spencer*, 100 Mass. 382; *Petrie* v. *Clark*, 11 Serg. & R. 377. In *Field* v. *Schieffelin*, Chancellor KENT examined all the English cases up to that date, (1823,) and his conclusion was that they all agreed that the purchaser is safe, 'if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was in fact, by the very transaction, applying them to the extinguishing of his own private debt. The great difficulty has been,' continued the chancellor, ' to determine how far the purchaser dealt at his peril, when he knew, from the very face of the proceeding, that the executor was applying the assets to his own private purposes, as the payment of his own debt. The later and the better doctrine is that in such a case he does buy at his peril; but that, if he has no such proof or knowledge, he is not bound to inquire into the state of the trust, because he has no means to support the inquiry, and he may safely repose on the general presumption that the executor is in the due exercise of his trust.' The rule was stated by Chief Justice TANEY in *Lowry* v. *Bank*, Taney, 310, as follows: 'If a party dealing with an executor has at the time reasonable ground for believing that he intends to misapply the money, or is in the very transaction applying it to his own private use, the person so dealing is responsible to the persons injured.' And the same rule was put in another form by the house of lords, in 1861, in *Walker* v. *Taylor*, 4 Law T. (N. S.) 845: ' Where an executor parts with any portion of the assets of the testator, under such circumstances as that the purchaser must be reasonably taken to know that they were sold, not for the benefit of the estate, but for the executor's own profit, the result is that the purchaser holds the assets as if he were himself, in respect of those assets, the executor.' See, also, *Leitch* v. *Wells*, 48 N. Y. 585; *Goodwin* v. *Bank*, 48 Conn. 550; Cook, Stock, 474, and cases there cited.

"The present case is analogous to *McLeod* v. *Drummond*, 14 Ves. 352, 17 Ves. 152, which was carefully analyzed by Chancellor KENT in *Field* v. *Schieffelin*. There was, in *McLeod* v. *Drummond*, a pledge by the executor of the testator's bonds upon advances of money. The bill, as here, was by a coexecutor, and it was dismissed by the master of the rolls, and the decree was affirmed on appeal to the lord chancellor. The master of the rolls said he had found no case where the money had been advanced at the time to the full value of the assets that it was ever called back. Lord ELDON, on the appeal, declared that, on a sale by the executor for money advanced at the time, the lender could never be affected by proving the executor's intention at the time to misapply the money. The third person, if there was no more in the transaction, would be justified in assuming that the sale was for those purposes for which the law gives the executor the power of sale. The conclusion, in substance, was that, to charge the purchaser, he must have had direct evidence that the advance was not for a purpose connected with the administration of the assets, but for a different purpose, and that the executor was going to misapply the fund. Both upon principle and authority, then, the plaintiff in the present case must fail. We will assume that the bank was bound to notice the manner in which the bonds were registered. What then? It simply advanced money to one of the executors upon the collateral security of the testator's bonds, registered in the name of the two executors. There was absolutely nothing more than this in the transaction. It is true that in form the advance was to John J. Louth personally. That is, he did not add the descriptive word ' executor ' to his signature to the stock-note, nor did the bank add such word to the name of Louth as the payee of its check, nor did Louth inform the bank that he desired the loan for the purposes of the estate. But

all this was implied.upon the face of the transaction, and the bank is certainly not chargeable because its president supposed that he was dealing with Louth personally, when, if he had noticed the manner in which the bonds were registered, what transpired need not have been changed, even in matter of detail.  For the debt contracted by Louth as executor was in law personal, and it would have been just as much personal whether he added to his signature to the stock-note his executorial description or not.  The form of the transaction, therefore, was unobjectionable.  It appropriately effected a loan to the estate, and, so far as it spoke at all, it spoke of a loan to the executor for the purposes of the estate.  It did not, of itself, effect a misappropriation of the funds of the estate, and it certainly gave no hint to the bank of an intended misappropriation.

"On the main question there should be judgment for the defendant, but as the bonds have been sold by the bank to pay the loans made to Louth, and as upon such sales there remains a surplus in the hands of the bank, the plaintiffs may have judgment therefor, without costs."

From the judgment entered accordingly plaintiff appeals.

Argued before VAN BRUNT, P. J., and PATTERSON, J.

*Emmet & Robinson,* (*R. E. Robinson,* of counsel,) for appellant.  *Butler, Stillman & Hubbard,* (*Adrian H. Joline,* of counsel,) for respondents.

PATTERSON, J.   We agree with the learned judge by whom this cause was decided at the special term that the defendant bank acquired a good title as pledgee of the six bonds from Louth, and that the testimony was insufficient to prove notice to the bank that Louth was disposing of the assets of the estate of his testator for his own benefit, or that it was put upon inquiry before it made the loan.   The collection and criticism of the cases contained in the opinion of the court below covers the whole field of argument, and it is unnecessary to repeat what is there said; but we think that too close a deduction has been made from them.   We do not concur in the exact statement of the rule as laid down by the learned judge, viz., that, to charge a purchaser or pledgee in every case, he must have had direct evidence that the money was not paid or advanced to the executor for a purpose connected with the administration of the assets, but for a different purpose, and that the executor was going to misapply the funds.   Undoubtedly, under the cases referred to and commented upon in the opinion, the purchaser or pledgee may, up to a certain point, rely on the general presumption that an executor is acting for the estate, and is not committing a *devastavit;* but if such facts are disclosed as would put the party, he being a person of ordinary prudence, on inquiry, he cannot supinely rest on the presumption, when inquiry would lead him to detect the wrongful purpose of the executor, and result in knowledge.   *Lowry* v. *Bank,* Taney, 310.   We assume that by the words "direct evidence" the learned judge meant evidence which of itself, and by necessary conclusion, establishes the guilty or fraudulent purpose; and it is in that view we cannot assent to the precise formulation of the rule, otherwise properly applied.   But with the explanation mentioned the conclusions of the court below were entirely correct.   Nothing occurred in the transaction, from first to last, to put the bank upon notice or inquiry of a title that could not be transferred, or of any intent on the part of Louth to despoil the estate of which he was executor.   When application was first made to Mr. Murray, the president of the bank, it was stated merely that Louth wanted to borrow on certain registered bonds, and he was told the registration must be transferred to the name of the bank.   That was done, and nothing then appeared on the production of the bonds, except that title had been made by a transfer from executors.   The bank was not required to institute or prosecute inquiries, nor to ask questions on that simple circumstance.   The judgment was right, and must be affirmed, with costs.